**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street – Suite 1201
Newark, New Jersey 07102
Telephone: 973-623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

*Attorneys for Plaintiff*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SARATOGA ADVANTAGE TRUST HEALTH & BIOTECHNOLOGY PORTFOLIO, Derivatively and on Behalf of CELGENE CORPORATION, | : <br> : <br> : <br> : Civil Action No.: 18-11589 <br> : <br> : |
| Plaintiff, | : <br> : |
| vs. | : **VERIFIED SHAREHOLDER** <br> : **DERIVATIVE COMPLAINT** <br> : |
| MARK J. ALLES, RICHARD W. BARKER HANS BISHOP, MICHAEL W. BONNEY,  MICHAEL D. CASEY, CARRIE S. COX, MICHAEL A. FRIEDMAN, GILLA KAPLAN, JAMES J. LOUGHLIN, and ERNEST MARIO, | : **DEMAND FOR JURY TRIAL** <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : |
| -and- | : <br> : |
| CELGENE CORPORATION, | : <br> : |
| Nominal Defendant. | : <br> : |

743982.1

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff Saratoga Advantage Trust Health & Biotechnology Portfolio for the benefit of Celgene Corporation ("Celgene" or the "Company") against Defendants Mark J. Alles, Richard W. Barker, Hans Bishop, Michael W. Bonney, Michael D. Casey, Carrie S. Cox, Michael A. Friedman, Gilla Kaplan, James J. Loughlin, and Ernest Mario ("Defendants"), who are current members of Celgene's Board of Directors (the "Board").   This action seeks to recover for Celgene and its shareholders the hundreds of millions of dollars in financial damages and corporate waste caused by Defendants' failure to adequately supervise the Company.   As a result of Defendants' actions and inactions, the Company is now subject to serious legal liability.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

3.      Venue is proper in this District because Celgene is headquartered in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

743982.1

## THE PARTIES

4.     Plaintiff Saratoga Advantage Trust Health & Biotechnology Portfolio ("Plaintiff" or "Saratoga") is an investment firm incorporated in Delaware, and headquartered in Arizona.  As set forth in the accompanying certification, Plaintiff is, and at all relevant times was, a holder of Celgene common stock.

5.     Nominal   Defendant   Celgene   is   a   biotechnology   company headquartered in Summit, New Jersey. It specializes in treatments for cancer and inflammatory diseases through next-generation solutions in protein homeostasis, immuno-oncology, epigenetics, immunology and neuro-inflammation.

6.     Defendant Mark J. Alles ("Alles") has been the Chief Executive Officer of Celgene since March 2016 and its Chairman of the Board since February 6, 2018. He previously served as the Company's President and Chief Operating Officer.

7.     Defendant Richard W. Barker, D.Phil., OBE ("Barker"), was elected to the Celgene Board in January 2012 and is a member of the Audit Committee.

8.     Defendant Hans Bishop ("Bishop") was elected to the Celgene Board in April 2018.

9.     Defendant Michael W. Bonney ("Bonney") was elected to the Celgene Board in April 2015. He is a member of the Executive Committee and the Nominating, Governance and Compliance Committee.

743982.1

10.     Defendant Michael D. Casey ("Casey") was elected to the Celgene Board in August 2002 and has been the Lead Independent Director since June 2007. He is the Chairman of the Nominating, Governance and Compliance Committee, a member of the Executive Committee, and a member of the Compensation and Development Committee.

11.     Defendant Carrie S. Cox ("Cox") was elected to the Celgene Board in December 2009 and is a member of the Compensation and Development Committee.

12.     Defendant Michael A. Friedman ("Friedman") was elected to the Celgene Board in February 2011 and is a member of the Nominating, Governance and Compliance Committee.

13.     Defendant Gilla Kaplan ("Kaplan") was elected to the Celgene Board in April 1998.

14.     Defendant James J. Loughlin ("Loughlin") was elected to the Celgene Board in January 2007. He is the Chairman of the Audit Committee and a member of the Compensation and Development Committee.

15.     Defendant Ernest Mario, Ph.D. ("Mario") was elected to the Celgene Board in August 2007. He is the Chairman of the Compensation and Development Committee, a member of the Nominating, Governance and Compliance Committee, and a member of the Executive Committee.

16.     Defendants, because of their positions on Celgene's Board, possessed the power and authority to control Celgene's business and corporate affairs. Defendants owe, and owed, Celgene and its shareholders a fiduciary duty of loyalty and were and are required to use their utmost ability to control and manage Celgene in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Celgene and its shareholders so as to benefit all Celgene's shareholders equally and not in furtherance of Defendants' personal interest or benefit.

17.     To discharge their duties, directors of Celgene were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and business affairs of Celgene.

## SUBSTANTIVE ALLEGATIONS

18.     Celgene is a biotechnology company that specializes in the discovery, development and commercialization of therapies for the treatment of cancer and inflammatory diseases. The Company has historically generated the majority of its revenues from the sale of Revlimid, which is currently approved to treat multiple myeloma, or plasma cancer. Revlimid is a derivative of thalidomide (which Celgene also sells, under the trade name Thalomid). Revlimid accounted for more than 60% of Celgene's total net product sales for the year ended December 31, 2016.

743982.1

19.     Revlimid will lose its patent exclusivity in the European Union in 2024 and in the United States in 2027, at which point cheaper generics will be able to enter the market, driving down the cost of Revlimid and, consequently, Celgene's revenues and expected future cash flows.

20.     Accordingly, the Company has been working to prevent the onset of generic versions of Revlimid, while developing additional revenue streams from its flagship drug. For example, Celgene has been named by the FDA for its "gaming" tactics in delaying potential generic applicants from obtaining samples of Revlimid, a necessary step in developing a generic drug. This has led to a number of lawsuits by competitors who would like to sell generic versions of the drug earlier. In 2015, Celgene settled with one of its competitors, Natco Pharma Ltd., and agreed to allow it to sell a limited quantity of Revlimid generics beginning in 2022.

21.     Additionally, taking a page from 'Pharma Bro' Martin Shkreli's playbook, the Company dramatically increased the price of Revlimid to drive revenue growth in recent years. Since 2010, the price of treatment with Revlimid has tripled to more than $20,000 per month.

22.     The Company has also promoted Revlimid for unapproved off-label uses, leading Celgene agreed to pay $280 million to settle a whistleblower lawsuit that claimed the Company had defrauded the government and paid kickbacks to doctors in order to induce them to use these risky and powerful drugs on cancer

6

patients in a manner "tantamount to ongoing human experimentation."

23.     However, the above unethical (and often illegal) tactics will not prevent the Revlimid patent from expiring and the inevitable competition. As a result, it was important to investors that the Company develop and successfully commercialize new drugs to diversify and ultimately replace its reliance on revenues from Revlimid sales. Three of the most promising drugs in Celgene's product pipeline to replace Revlimid were: (i) GED-0301 (also known as Mongersen), a late-stage developmental treatment for Crohn's disease; (ii) Otezla, a commercial-stage treatment for psoriasis approved by the FDA in 2014; and (iii) Ozanimod, a developmental treatment for relapsing multiple sclerosis and ulcerative colitis.  In its race to replace Revlimid, and secure additional future revenue streams, Defendants and other senior executives of Celgene did not take steps to address fundamental failures in the Company's pharmaceutical development, and the reporting of the same to investors.

The Failed Development of GED-0301

24.     In April 2014, Celgene acquired GED-0301, an oral antisense oligonucleotide compound that is a developmental treatment for Crohn's disease, from Irish-based pharmaceutical startup Nogra Pharma Limited for $710 million. This amount was shocking to many analysts, GED-0301 was an unknown, first-generation oligonucleotide.

743982.1

25.     Celgene hailed the drug as a "potentially transformative therapy" that had demonstrated "striking clinical activity in a phase II trial." According to Celgene, over half of the patients in the study who took higher doses of GED-0301 achieved clinical remission. The Company stated that it would begin registration for a phase III trial by the end of 2014.

26.     Celgene and its top executives went to great lengths to dispel investors' concerns regarding the viability of GE-0301. Following the drug's acquisition, they began touting GED-0301 as "a multibillion-dollar asset" and, together with Otezla and Ozanimod, as an eventual "replacement" for the Company's Revlimid revenues. As an expression of the confidence management purportedly had in GED-0301, Otezla, Ozanimod and Celgene's other pipeline products, in January 2015 the Company unveiled a five-year strategic plan. The Company projected $21 billion of net product sales by 2020, or nearly triple the Company's total net product sales for fiscal 2014, which included hundreds of millions of dollars of sales from GED-0301 and an expansion in Otezla sales.

27.     In March 2015, Celgene and Company representatives continued to tout the drug's potential. For example, following the publication and presentation of the trial's primary findings, Scott Smith, the head of Celgene's inflammation and immunology unit, who was promoted to Chief Operating Officer in 2017, stated that "'[t]he analysis . . . suggests that patients with more severe Crohn's disease or a

longer duration of disease were able to achieve clinical response or clinical remission with the 160 mg dose of GED-0301.'" However, serious criticisms of these trials developed. Indeed, Dr. Severine Vermeire questioned the sample population in the phase II trial:

> However, the inclusion criteria used by Monteleone and colleagues were based on the CDAI score and did not include more objective criteria for active disease. Endoscopic confirmation of active Crohn's disease was not an inclusion criterion, so it is unclear what proportion of patients underwent randomization without actually having mucosal lesions
>
> &ast;   &ast;   &ast;
>
> Moreover, the median level of C-reactive protein among patients at the beginning of the study was surprisingly low (4 to 5 mg per liter), and 39% of patients did not have elevated levels. Not all persons with Crohn's disease have elevated C-reactive protein levels, but 39% of trial participants with normal levels seems unusually high.

28.     On September 12, 2016, the Company released topline data from an interim endoscopy trial for GED-0301, known as "CD-001." The Company hailed the CD-001 results as demonstrating "both endoscopic improvements and clinically meaningful responses and remission at an early timepoint in this study." By enrolling more severe Crohn's disease patients across a wider variety of test sites, the study was designed to address and dispel investor concerns related to phase II trial results. As Celgene's Global Head of Medical Affairs stated at the time, "***With the interim results from CD-001, we now feel more confident most of the questions have been addressed***." In the following weeks, the Company continued to receive interim trial

9

data about the efficacy of GED-0301 and to analyze these data, as CD-001 entered a 52-week observational phase after the treatment phase and the Company continued to analyze data from the treatment phase. Throughout this process, the Company presented nothing but the rosiest results.

29.    But during the initial CD-001 trial, Celgene had failed to adhere to basic clinical standards, such as use of a placebo control arm trial. When pressed to defend the lack of a placebo control arm during an analyst call discussing the results, a Company representative claimed that any placebo would have shown "nearly zero" endoscopic remission given the severity of the baseline patient population. In truth, Celgene had designed a faulty interim endoscopy trial in order to dispel investor concerns about its phase II trial, while misrepresenting the importance of the results. Alles would later admit, at the Bernstein Strategic Decisions Conference in New York, that Celgene should have conducted a randomized phase II clinical study of GED-0301 with a controlled placebo group. As Celgene and its top management knew, or recklessly disregarded, but failed to disclose, GED-0301 had not shown meaningful or sustained efficacy through the interim endoscopy trial, and the phase III trial had a materially greater likelihood of failure than publicly disclosed.

30.    Over the next year, top Company executives participated in more than a dozen analyst calls, industry conferences and investor meetings in which they claimed

743982.1

that GED-0301 continued to show transformative promise, that the Company's 2020 guidance would be met or exceeded, and that Celgene would be able to develop the revenue streams necessary to replace Revlimid and continue the Company's growth. For example, during a January 9, 2017 analyst conference, Celgene's CEO Alles touted GED-0301, Ozanimod and Otezla as "an opportunity to, *literally, change the entire landscape* of how these diseases are treated over the next year to 10 years" and help "create *a multi-billion-dollar* add on to our current product portfolio." Similarly, on September 14, 2017, Chief Financial Officer Peter N. Kellogg told investors that Celgene had a "tremendously powerful and rich pipeline," with GED-0301 as a key component that "*will drive our business . . . throughout the entire next decade*." On September 26, 2017 – with only four days left in Celgene's third fiscal quarter – the Company's President of Hematology & Oncology, Nadim Ahmed, stated that Celgene had great "*visibility*" from recent trial data indicating that GED-0301 would be a potential "*blockbuster*," that Otezla's "ex U.S. sales" were growing "*at a greater than 100% clip*," and that, as a result, the Company was "*very, very confident about 2020* in terms of meeting or exceeding our expectations."

31.    Less than one month after the last of these public statements, on October 19, 2017, the Company shocked investors when it revealed that it would be abandoning its long-touted drug GED-0301, discontinuing ongoing trials, and recording a *$1.6 billion impairment charge* (with certain offsets) as a result of the

743982.1

drug's failure. The move followed a futility analysis by an independent Data Monitoring Committee that had determined the drug was ineffective. On this news, the price of Celgene stock fell $14.63 per share to close at $121.33 per share on October 20, 2017, a one-day decline of nearly 11%.

32.    There has been no explanation regarding why Celgene's management had been heavily touting the commercial viability of a drug, only to reverse course when the internally available clinical data was examined by an independent Data Monitoring Committee. Of course, such blatant contradictions have led to a number of shareholder lawsuits.

33.    Accordingly, GED-0301 represented a waste of hundreds of millions, if not billions, of dollars for the Company. GED-0301 represented an embarrassing black-eye for the Company's clinical development, created significant distrust among the Company's investors, and erased a large portion of the Company's market cap. Yet, no remedial measures have been taken by the Company or the Board. Instead, in the press release announcing the failure of GED-0301, Smith publicly thanked the investigators involved in the [GED-0301]." However, GED-0301 was not the only Celgene drug development that was problematic.

<u>Otezla Fails to Meet Expectations</u>

34.    On October 26, 2017, Celgene released its third quarter 2017 results. The Company once again surprised investors by revealing that certain key drugs had

743982.1

missed expectations for the quarter. Most notably, sales for Otezla – which Celgene representatives had just recently claimed were "going very, very well" – had in fact slowed to only 2% U.S. growth, compared to 41% year-over-year U.S. growth the prior quarter. The Company also posted only an 87% increase in international sales, far below the "greater than 100% clip" touted by Company representatives at the end of the quarter. Worse still, Celgene revised downward its 2020 guidance as a result of the poor results and the loss of projected GED-0301 revenues. While guidance for total product sales was lowered from $21 billion to a range of $19 billion to $20 billion, management *raised* projections for Revlimid and its existing hematology products, with these drugs' proportion of overall sales increasing from 62% in the original guidance to up to 77% of total projected product sales in the revised guidance. Consequently, the Company revealed that it was much more dependent on Revlimid sales for its future success than it had previously disclosed. On this news, the price of Celgene stock plummeted another $19.57 per share to close at $99.99 per share on October 26, 2017, a one-day decline of over 16%.

35.     In the wake of these shocking disclosures, Defendants sought to reassure investors about the Company's product pipeline and ability to replace Revlimid revenues by pointing to the sales potential of Ozanimod. For example, on the October 26, 2017 conference call to discuss the Company's third quarter 2017 results, defendant Alles stated that the Company would "immediate[ly] shift from GED-0301

743982.1

to ozanimod in Crohn's disease," and cited this treatment as "a great example of the pipeline optionality and opportunity we have built and continue to build into our research." In subsequent months, defendants described Ozanimod as the "platform molecule" of the Company, with expected sales revenue in the billions, and touted Celgene's submission of its NDA for Ozanimod to the FDA at the end of 2017 as an indication that the Company was on track to achieve these sales goals.

<u>Celgene Receives a Refusal to File Letter for the FDA on Ozanimod</u>

36.     The Company tried to reassure the market after the failure of GED-0301 by claiming that the approval of Ozanimod, Celgene's third purported revenue driver, would offset the lost GED-0301 opportunity.  However, Celgene failed to disclose that it had not collected sufficient nonclinical and clinical pharmacology data for Ozanimod in recent clinical trials to allow for FDA review. Instead, defendants continued to represent that the new drug application ("NDA") for Ozanimod would be sent to the FDA by the end of the year, despite this lack of data, in order to allay investor concerns over the Company's operational setbacks.

37.     For example, on October 26, 2017, during the same conference call in which defendants revealed Celgene's disappointing third quarter financial results, defendants pointed to the potential of Ozanimod. In his prepared remarks, defendant Alles stated in pertinent part:

> While sales of GED-0301 were relatively modest in our 2020 model, we
> did forecast multibillion dollar peak sales potential. We are encouraged

by the recently presented ozanimod Phase II data in Crohn's disease and expect to initiate a Phase III study of this novel agent in Crohn's within the next few months. We are committed to building a leading inflammatory bowel disease franchise, now led by ozanimod, for the treatment of ulcerative colitis and Crohn's and perhaps OTEZLA in one or both of these serious unmet medical conditions. And this immediate shift from GED-0301 to ozanimod in Crohn's disease is a great example of the pipeline optionality and opportunity we have built and continue to build into our research model for hematology, oncology and inflammation and immunology.

38.     During the same call, Curran stated that Celgene had continued to make "good progress" in developing Ozanimod and that the drug "remains on track for regulatory submission, beginning with the U.S. by year-end and the EMEA in the first half of 2019."

39.     The Company also highlighted the quality of the data that Celgene would be submitting to the FDA as part of the NDA for Ozanimod. For example, Company representatives Jeffrey Cohen and Philippe Martin stated, respectively, that the data was obtained through "very rigorously performed trials," which would "form the basis of [Celgene's] submission to the FDA." Curran, after highlighting the "market opportunities" for Ozanimod, again stated that the Company was on track "to fil[e] or submit [a] filing by the end of the year in the U.S. and the EMEA the first half of next year." When asked by an analyst whether the Company had "enough data" on Ozanimod for a favorable label determination from the FDA, Company representative Philippe Martin responded that the "data we have is particularly compelling in our minds." Similarly, Smith stated that the data Celgene had collected for Ozanimod was

the "best case scenario for being able to make a really positive, strong argument [to the FDA] and certainly we will."

40.     On November 7, 2017, Celgene hosted another conference call with investors, during which Kellogg touted the "very promising" and "detailed data for ozanimod in multiple sclerosis." Kellogg described Ozanimod as a "high-potential asset[]," and stated that he was "relatively bullish on the opportunity for multiple sclerosis."

41.     Celgene increased its rhetoric promoting Ozanimod after Celgene submitted the NDA for the drug to the FDA at the end of 2017. On a January 8, 2018 conference call, defendant Alles called Ozanimod the "platform molecule for the company," a "multibillion-dollar blockbuster," and a "derisked asset" because of its multiple potential applications. In his prepared remarks, Alles once again highlighted the quality of the data the Company had submitted to the FDA in seeking the drug's approval:

> And of course, in neurosciences, we're very proud and pleased with the results of the 2 Phase III trials that were released last year and presented at ECTRIMS late in the year. We believe that the efficacy from these 2 trials comparing ozanimod to Avonex in relapsing-remitting MS presents a highly favorable and competitive position for the brand, starting with the efficacy and then moving through the favorable safety and tolerability profile. We are very excited about it. As I said, the NDA was submitted the end of last year. We look forward to working with the FDA to bring this molecule to patients in the U.S. and then around the world as quickly as possible.

42.     During a January 25, 2018 conference call, Curran stated that the data

16

submitted to the FDA "support a differentiated clinical profile" and that the Company was "preparing for a world-class launch in the RMS ["relapsing multiple sclerosis"] market" for Ozanimod. She continued, "With ozanimod, we are planning to secure FDA approval in RMS by year-end and to submit international registration dossiers in 2018 starting with Europe in Q1." Later, in response to an analyst question about potential monitoring requirements for Ozanimod, Curran stated: "Clearly, from the data, we have a highly differentiated compound both in terms of efficacy, safety and tolerability. So we'll continue to discuss the potential label with the authorities but at this case – at this stage that is the base case."

43. On February 27, 2018, Celgene once again stunned investors when it revealed that the FDA had issued a Refusal to File ("RTF") letter for Ozanimod. The FDA cited both the nonclinical and clinical pharmacology sections in the NDA as insufficient to permit a complete review. It is very rare for a company of Celgene's stature to be sent a RTF letter, which is effectively a refusal by the FDA to even consider whether a medicine should be approved.

44. It has been reported that Celgene took a gamble, filing the application before having the results of a six-person study initiated in October 2016. But the fact that this study was necessary is likely indicative of greater problems at Celgene. As noted by Leerink analyst Geoffrey Porges, "[t]he completion of the study itself suggests some recognition of a deficiency in the clinical package prepared by the prior

17

owner," he said in a note to clients. "The FDA appeared to surprise the company by demanding that this variance, and the full data, be added to the entire application."

45.     In response to this embarrassing setback, Ahmed admitted that the NDA was inadequate and even noted that officials at the FDA were "actually quite surprised" to receive the subpar application. Ahmed even admitted that "I think that 99 per cent of folk at Celgene wouldn't have submitted [the FDA application]." Nevertheless, the NDA was submitted because of insufficient controls between Celgene and its subsidiaries.

46.     Market reaction was swift and severe, with one commentator calling Celgene's failure "hard to accept as a reality; *it's almost unheard of for a major company*."  Shares in Celgene fell by about 22% since February, when it was first revealed the FDA had sent it a Refusal to File letter, while its market value of $56bn is roughly half its peak in autumn of last year. This makes Celgene, once a darling of the biotech industry, one of the worst preforming pharmaceutical stocks of the year.

47.     The Company is not expected to resubmit its Ozanimod NDA until next year. Accordingly, FDA approval of ozanimod will likely be delayed by a year or more, resulting in a significant loss of potential revenue for the Company. Combined with the failure of GED-0301 and the underperformance of Otezla, the Company's strategy to replace the revenues lost by the sale of Revlimid is in question and

743982.1

investors have lost confidence in the Company's leadership. "Investors in Celgene's stock are likely to start clamoring for more aggressive and extensive changes in the company's leadership and direction after yet another disappointment," Leerink's Porges said. Despite calls for reform, the Board has done nothing. The Board's abdication of oversight is shocking.

48.     Indeed, due to the lack of oversight, the Company has already begun to suffer damages. Aside from the corporate waste and significant drop in the Company's stock price described herein, investors have initiated securities class actions against the Company, as well as members of the Board and the Company's management team, for releasing false and misleading statements to the public. *See City of Warren General Employees' Retirement System v. Celgene Corporation, et al.,* No. 2:18-CV-04772 (D.N.J. 2018), and *Witchcoff v. Celgene Corporation, et al.,* No. 2:18-CV-08785 (D.N.J. 2018). These preventable actions are only going to drain more resources from the Company and cause further damage to Celgene's bottom line.

## DEMAND FUTILITY ALLEGATIONS

49.   Plaintiff has not made any demand on the Board to institute this action against Defendants. Such demand would be futile because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

743982.1

50.   Celgene's Board consists of defendants Alles (its Chairman), Barker, Bishop, Bonney, Casey, Cox, Friedman, Kaplan, Loughlin, and Mario (collectively, the "Demand Directors"). Based upon the facts set forth herein, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Demand Directors to institute this action against the Demand Directors is excused as futile. A pre-filing demand would be a useless and futile act because each of the Demand Directors has already conceded through their individual SEC filings that they are holders of Celgene securities and/or have a vested interest in stock options exercisable in the near future and, thus, have conflicts between their pecuniary interests and those of Celgene shareholders at large such that the Board does not have a majority of disinterested and/or independent members. As set forth herein, the Demand Directors have acknowledged (in Company SEC filings and press releases) that they have concealed and obfuscated the efficacy of Celgene's GED-0301 development and the ability of Ozanimod and Otezla "pipeline product stream" to supplant the revenue flow currently occupied by Revlimid in the near and/or long term horizon. Clearly, and based on the facts alleged above, a majority of the Demand Directors could not have independently and disinterestedly investigated the claims alleged herein. As such, it would be totally unreasonable to expect Plaintiff to make a demand on these directors, who have already conceded that they are not

20

743982.1

disinterested and/or independent.  Accordingly, demand is excused.

51.  Demand is also excused for the following reasons:

(A)    The Demand Directors have already conceded that they do not have a majority of disinterested and/or independent members. As set forth herein, under the terms of the Nominating, Governance and Compliance Committee, the Compensation and Development Committee, and Celgene's Audit Committee defendants Barker, Bonney, Casey, Cox, Friedman, Loughlin, and Mario were and remain expressly authorized to conduct investigations related to, among other things, the Company's falsification and misreporting of Celgene's GED-0301 and Ozanimod clinical drug trials upon which the Company hinged its future financial success.  In these positions, defendants also had non-public information regarding the underperformance of its Otezla psoriasis treatment product.

(B)    Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Kaplan, Loughlin, and Mario (each of whom served on the Board's Nominating, Governance, Compliance, Compensation and/or Audit Committees during the Relevant Period) are interested because they face a substantial likelihood of liability for their conduct on the Board as a result of their integral roles in the concealment of Celgene's GED-0301 and Ozanimod failed clinical drug trials and lacking Otezla sales revenue. Accordingly, their personal potential liability for the acts (and failures to act) alleged herein casts doubt about their

ability to disinterestedly evaluate a demand. Thus, because Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Kaplan, Loughlin, and Mario comprise a majority of the Demand Directors, demand is excused.

## COUNT I
### Violation of Section 10(b) of the Exchange Act
### Against Defendant Alles

52.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

53.     Defendant Alles caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders. Defendant Alles is sued herein for the false statements made regarding GED-0301, Otezla, and Ozanimod as described above, which he knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

54.     Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices,

and a course of business that operated as a fraud or deceit upon Celgene in connection with the development GED-0301, Otezla, and Ozanimod.

55.     Investors have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Celgene common stock. Investors would not have purchased Celgene common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

56.     As a direct and proximate result of Defendant Alles' wrongful conduct, the Company suffered damages. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act.

<u>**COUNT II**</u>
**Breach of Fiduciary Duty**
**Against All Individual Defendants**

57.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

58.     The Individual Defendants owed and owe fiduciary duties to Celgene and its stockholders. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Celgene shareholders, and the Company itself, the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of Celgene's clinical trials, financial reporting, and compliance with various laws, regulations,

23

and internal policies.

59.     The Individual Defendants consciously breached their fiduciary duties, and violated their corporate responsibilities, in at least the following ways: (i) allowing the Company to engage in a unlawful off-label marketing campaign, leading to False Claim Act allegations, (ii) willfully abdicating their roles as fiduciaries by permitting the Company to ignore the most basic scientific standards when conducting important clinical studies, (iii) allowing admittedly patently unacceptable filings to the FDA, (iv) allowing fundamentally false and misleading information to be disseminated to investors; and (v) failing to investigate the above failures and take remedial action.

60.     As a direct and proximate result of Defendants' conscious failure to perform their fiduciary duties, Celgene has sustained, and will continue to sustain, significant damages – both financially and to its corporate image and goodwill. Such damages to Celgene caused by the Individual Defendants include, and will include, the substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, and other liabilities described herein.

<u>**COUNT III**</u>
**Waste of Corporate Assets**
**Against All Individual Defendants**

61.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

62.     By their actions alleged above, and by failing to properly consider the interests of Celgene and its public shareholders by failing to conduct proper supervision, Defendants have caused the Company to waste valuable corporate assets by allowing the Company to release misleading information to the public and to incur millions of dollars of legal liability and legal costs to defend Defendants' unlawful actions.

63.     As a result of the waste of corporate assets, Celgene has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

64.     The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Celgene is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     A judgment finding that a shareholder demand on Celgene would have been a futile and useless act;

B.     A judgment finding that Defendants have breached their fiduciary duties to Celgene;

C.     A judgment against all Defendants, and in favor of Celgene, for an

25

amount of damages sustained by Celgene as a result of the breaches of fiduciary duties by each of the Defendants as alleged herein, jointly and severally, in an amount to be determined at trial;

D.     A judgment requiring Defendants to return to Celgene all compensation and remuneration of whatever kind paid to them by Celgene during the time that they were in breach of their fiduciary duties owed to Celgene;

E.     Pre- and post-judgment interest;

F.     Injunctive relief directing Defendants to establish, maintain, and fully fund effective compliance programs to ensure that Celgene conducts clinical trials within accepted standards and does not engage in wrongful, misleading, or illegal business practices;

G.     Appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

H.     Costs and disbursements of this action, including reasonable attorneys' fees and expenses;

I.     Such other relief as the Court may deem just and proper.

743982.1

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: July 12, 2018                    Respectfully submitted,

*/s/ Bruce D. Greenberg*

Bruce D. Greenberg
**LITE DEPALMA GREENBERG LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk (*Pro Hac Vice to be filed*)
550 W. C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

***Attorneys for Plaintiff***

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following actions pending in this Court: *City of Warren General Employees' Retirement System v. Celgene Corporation, et al., No. 2:18-CV-04772 (D.N.J. 2018), and Witchcoff v. Celgene Corporation, et al., No. 2:18-CV-08785 (D.N.J. 2018).*

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: July 12, 2018                    Respectfully submitted,

*/s/ Bruce D. Greenberg*
Bruce D. Greenberg
**LITE DEPALMA GREENBERG LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: bgreenberg@litedepalma.com

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk (*Pro Hac Vice to be filed*)
550 W. C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

***Attorneys for Plaintiff***

743982.1

**RULE 23.1 VERIFICATION**

I, Bruce E. Ventimiglia, President and Authorized Representative of Saratoga Advantage Trust Health & Biotechnology Portfolio ("Plaintiff"), declare that I have reviewed the Complaint against Defendants Celgene Corporation, Mark J. Alles, Richard W. Barker, Hans Bishop, Michael W. Bonney, Michael D. Casey, Carrie S. Cox, Michael A. Friedman, Gilla Kaplan, James J. Loughlin, and Ernest Mario. Plaintiff is, and remains, a shareholder in Celgene Corporation. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 11th day of July, 2018 at Goodyear, Arizona.


_____
Bruce E. Ventimiglia

President and Authorized
Representative of Saratoga
Advantage Trust Health &
Biotechnology Portfolio